UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
JORGE LARA CRUZ,

                             Plaintiff,                        **MEMORANDUM & ORDER**

                          -against-                          06 CV 1939 (RJD) (JMA)

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,
                             Defendant.
-------------------------------------------------X
DEARIE, Chief Judge.

Pursuant to 42 U.S.C. § 405(g), plaintiff Jorge Lara Cruz seeks to set aside the Commissioner's determination that he was not disabled within the meaning of the Social Security Act. The parties move for judgment on the pleadings. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

### A. Plaintiff's Age, Education, and Work Experience

Plaintiff, a forty-two-year-old male with a sixth grade education, was born in Honduras and came to the United States in 1984. Tr. 183. His English is limited, and he communicated with the assistance of a translator at both his interview for disability benefits and at his administrative hearing. Tr. 33, 181, 183. Since coming to the United States, plaintiff has worked as a machine operator in a factory and, more recently, in construction. Tr. 50, 184.

In October of 2002, plaintiff was injured while lifting a 100-pound container at a construction site. Tr. 86, 185. He stopped working in January of 2003 and remains unable to work. Tr. 185-86.

## B. Medical Evidence

### 1. Treating Physician Dr. Michael L. Abott and Dr. Ramon Vallarino

Dr. Michael L. Abott has been plaintiff's primary care physician since 1993. Tr. 51. Plaintiff first saw Dr. Abott about his work-related injuries in March of 2003.[1] Tr. 38.

On June 13, 2003, Dr. Abott ordered X-rays of plaintiff's "lumbosacral spine." Tr. 118. The images revealed "early degenerative changes of the lower cervical spine." Tr. 118.

In a disability-determination report dated March 24, 2004, Dr. Abott assessed plaintiff's residual functional capacity and range of motion. Plaintiff's right shoulder exhibited 90 degrees of forward elevation (normal is 150); 30 degrees of internal rotation (normal is 80); and 60 degrees of external rotation (normal is 90). Tr. 116. Plaintiff's hips extended 10 degrees backward (normal is 30). Tr. 117. Plaintiff could flex his cervical spine laterally 20 degrees in each direction (normal is 50); extend it 10 degrees (normal is 60); and rotate it 20 degrees on the right side (normal is 80). Tr. 117. He could extend his lumbar spine 30 degrees (normal is 90) and flex it laterally 5 degrees in each direction (normal is 25). Tr. 117. In Dr. Abott's view, plaintiff could stand or walk for less than two hours per day, sit for less than six hours per day, and occasionally lift no more than 5 pounds. Tr. 110.

Dr. Abott referred plaintiff to Dr. Ramon Vallarino in January of 2005. Tr. 159. Dr. Vallarino noted that plaintiff complained of "pain and spasm in the cervical area, the right shoulder, and the lumbar area." Tr. 159. He further noted that plaintiff's lumbar pain was so

---

[1] Plaintiff stated on a disability report form that he saw Dr. Michael Abott in March of 2003. Tr. 38. At his hearing, he stated that he saw a Dr. Michael Ovid on March 7, 2003. Tr. 187. Because there is no mention elsewhere in the record of a Dr. Michael Ovid, the Court assumes that plaintiff was either referring to Dr. Michael Abott or that the discrepancy is the result of a transcription error.

severe that he had gone to an emergency room the previous week. Tr. 159. Plaintiff's pain had similarly driven him to an emergency room at some point during the previous year. Tr. 159. Plaintiff had "severe discomfort" transferring from a chair to the examination table. His gait was "slow and antalgic" and he had "great difficulty" walking on his heels and toes. Though plaintiff's health was in "apparent good general condition," Dr. Vallarino found limited range of motion in his cervical spine and right shoulder and a loss of knee reflexes bilaterally. Tr. 159. There was an 80 percent loss of lumbar range of motion. Tr. 159. Dr. Vallarino further noted that the straight-leg raising test was positive. Tr. 159. In Dr. Vallarino's view, plaintiff suffered from "lumbar derangement with possible herniated disc, right shoulder derangement, [and] cervical derangement." Tr. 160. He ordered an MRI and X-rays and prescribed Motrin. Tr. 160.

Dr. Abott examined plaintiff on February 16, 2005. He noted that plaintiff was being treated for "cervical spine disease with severe pain" and had an upper respiratory tract infection. Tr. 158. He conducted routine tests of plaintiff's major systems (e.g., vital signs, eye and ear exam, lung exam) and found plaintiff's systems to be "within normal limits." Tr. 158. He prescribed Flexeril, a muscle relaxant. Tr. 158. There is no mention in Dr. Abott's notes that he conducted range of motion tests or ordered X-rays on this day.

On June 15, 2005, plaintiff again saw Dr. Abott and complained of "low back pain radiating from the thigh." Tr. 157. Dr. Abott once again conducted routine tests of plaintiff's major systems and found them to be "within normal limits." Tr. 157. He instructed plaintiff to "continue Crux." Tr. 157.

Dr. Abott submitted another written report around November of 2005. Tr. 147. He indicated that plaintiff complained of "back pain" and that there had been no significant change

3

in plaintiff's condition since Dr. Vallarino's examination almost a year earlier. Tr. 147. Dr. Abott attached copies of the range of motion and residual functional capacity assessments conducted on March 24, 2004. Tr. 153-54.

### 2. Treating Physician Dr. Glenn Jakobsen

Dr. Glenn Jakobsen began treating plaintiff for his injuries on October 24, 2003. Tr. 53, 83. He performed a comprehensive exam on that day and diagnosed plaintiff with cervical and lumbar disc displacement without myelopathy as well as shoulder joint pain and limb pain. Tr. 83. Records indicate that plaintiff received physical therapy from Dr. Jakobsen at Accu Care Medical & Rehab from October 24, 2003 to December 18, 2003, tr. 83-85, and was treated with the "Synergy Rehabilitation System," a form of isotonic exercise, tr. 107.

On November 10, 2003, Dr. Jakobsen completed forms for the Workers' Compensation Board of the State of New York. He indicated that plaintiff was under his care and that, in his view, plaintiff was totally disabled. Tr. 99-104. Dr. Jakobsen completed the same forms on November 14, 2003 and December 16, 2003 and likewise concluded that plaintiff was totally disabled. Tr. 86-98.

In a note dated January 19, 2004, Dr. Jakobsen deemed plaintiff "disabled and unable to work at this time." Tr. 106.

In a disability-determination report dated April 5, 2004, Dr. Jakobsen noted that plaintiff walked with a cane and required medical treatment during flare-ups. Tr. 120. As part of this report, Dr. Jakobsen conducted range of motion tests and found that plaintiff's cervical spine laterally flexed 35 degrees on the right side and 40 degrees on the left side (normal is 50); extended 50 degrees (60 is normal); and rotated 70 degrees to the right side and 65 degrees to the

4

left side (normal is 80). Tr. 122. He further found that plaintiff could flex his lumbar spine 70 degrees (normal is 90) and 20 degrees on each side (normal is 25). Tr. 122

On November 2, 2005, Dr. Jakobsen submitted a Physician's Report for Claim of Disability Due to Physical Impairment. He reported that he had seen plaintiff an average of two to three times a week since October of 2003, and that plaintiff complained of "consistent crippling pain"; pain in the neck and back; difficulty walking, bending, sitting, and sleeping; and "loss of sensation" in his hands and feet. Tr. 136, 138. Standing caused plaintiff pain, and he had to lie down during the day. Tr. 137. Plaintiff had spasms of the neck and lumbar paraspinals and a weakness of 4/5 in hip flexion and shoulder abduction. Tr. 136. An X-ray of the full spine was unremarkable, as were electromyography results for the cervical and lumbar regions. Tr. 137. Dr. Jakobsen concluded that plaintiff suffered from cervical/lumbar myofascitis and gait disorder. Tr. 137. His overall prognosis was "poor." Tr. 137. He noted that during an eight-hour work day, plaintiff could sit for four hours, stand for two hours, and walk for one hour. Tr. 139. He recommended 600 mg of Ibuprofen as needed. Tr. 138.

### 3. Treating Physician Dr. Irene Shulga and Psychologist William B. Bracero

On November 1, 2005, Dr. Shulga and psychologist William Bracero evaluated plaintiff and completed a medical assessment of his ability to do work-related activities. Tr. 142. Their diagnoses were major depressive disorder and generalized anxiety disorder. Tr. 142. They noted that plaintiff spoke of "disabling pain" in his back, neck, and head. Tr. 143. In their opinions, plaintiff had a "fair" ability to relate to co-workers, interact with supervisors, and follow work rules. Tr. 143. He had a "poor" ability to deal with work stress, function independently, and demonstrate reliability. Tr. 143-44.

5

### 4. Consulting Physician Dr. Robert Lee Davis

Dr. Robert Lee Davis examined plaintiff on April 15, 2004 for the Social Security Administration. Tr. 123. Dr. Davis wrote that plaintiff complained of pain in his lower back, right arm, and the right side of his neck. Tr. 123. Plaintiff had difficulty lifting his right arm. Tr. 123. Plaintiff was able to shower and dress himself "with difficulty." Tr. 124. He was taking Celebrex. Tr. 123.

Dr. Davis observed that plaintiff was in "moderate painful distress." Tr. 124. Plaintiff walked with deliberate, small steps and could only perform half of a full squat. Tr. 124. His station was antalgic. Tr. 124. He rose from the chair with "slight difficulty" and required no assistance in getting on and off the examination table. Tr. 124. He could perform the heel and toe walk with difficulty. Tr. 124.

Dr. Davis found that plaintiff could flex his cervical spine 30 degrees, extend it 10 degrees, and rotate it 45 degrees to the right and 60 degrees to the left. Tr. 124. He could laterally flex 20 degrees to the right and 25 degrees to the left. Tr. 124. He could flex his lumbar spine 60 degrees but had no extension. Tr. 125. Dr. Davis noted tenderness on the right side of the neck and in the mid-region of the spine. Tr. 124-25.

Dr. Davis diagnosed cervicalgia, lumbar radiculitis, and right shoulder strain. Tr. 125. He gave plaintiff a "stable" prognosis and recommended "moderate limitations to lifting, bending, climbing, and reaching with his dominant right arm." Tr. 125.

### 5. Other Medical Materials

The record also contains a residual functional capacity assessment conducted in April of 2004. Tr. 128-135. Though the signature on the document is barely legible, plaintiff's lawyer

maintains—and the government conceded at oral argument—that the form was filled out and signed by a disability examiner rather than a medical professional. Oral Argument Tr. 7-8. The examiner diagnosed plaintiff with cervical, lumbar shoulder strain and concluded that he could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for about six hours per day, and sit for about six hours per day. Tr. 129.

A handwritten page in the record titled "Medicine Taken by Mr. Jorge Cruz Lara" lists the following medications: "1) Tylenol—Dr. Abott; 2) Lexapro; 3) Hydroxyzine Pamoate—Dr. Shulga; 4) Gabapentin—Dr. Shulga." Tr. 165. There is no indication who filled out this form or what time period it reflects.

### 6. Evidence Submitted to the Appeals Council

Plaintiff submitted two additional MRIs to the Appeals Council. Each was performed after the ALJ heard plaintiff's case.

The first MRI of plaintiff's lumbar spine was conducted on December 8, 2005 and revealed multilevel discogenic disease. Tr. 178. The MRI showed disc desiccation and herniation at L3-4 and L4-5, tr. 177, and a mild broad-based annular disc bulge at L5-S1, tr. 178.

The second MRI of plaintiff's cervical spine was conducted on January 4, 2006 and revealed "mild degenerative changes," straightening of the cervical spine, and disc desiccation. Tr. 175. There were marginal hypertropic changes at C3-4 and very mild marginal hypertropic changes at C5-6 and C6-7. Tr. 176.

## C. Plaintiff's Testimony

At his hearing, plaintiff reported pain in his back, right arm, and in the lower part of his right leg. Tr. 191-92. He said his right leg cramps and feels numb at night. Tr. 191. Sitting and

bending are both difficult. Tr. 190-91. He also said he suffers from depression—a condition that developed after his accident. Tr. 188, 192.

Plaintiff stated that he lives with his sister. Tr. 182. He uses public transportation but can only walk four or five blocks before taking a three to five minute rest. Tr. 189, 191. He bathes himself with difficulty. Tr. 191. He visits with friends occasionally, but his depression often makes him not want to socialize, tr. 189, 192.

Plaintiff sees a psychiatrist and takes medication prescribed by the psychiatrist. Tr. 188. When asked how he relieves his pain, plaintiff responded that he takes "prescribed pills" but did not specify what kind or dosage. Tr. 190. He further stated that these pills cause dizziness and make him "feel like sleeping most of the time." Tr. 190-91.

## PROCEDURAL HISTORY

On February 24, 2003, plaintiff applied for Disability Insurance Benefits and Supplemental Security Income, citing an onset date of January 17, 2003. Tr. 14. On April 22, 2004, the Social Security Administration denied his claim. Tr. 27. On June 1, 2004, plaintiff requested a hearing before an Administrative Law Judge. Tr. 29. A hearing was held on November 17, 2005. Tr. 22.

On December 9, 2005, ALJ Wallace Tannenbaum ruled that plaintiff did not qualify for benefits. Tr. 20. On March 23, 2006, plaintiff's request for review was denied by the Appeals Council, and the ALJ's ruling became the final decision of the Commissioner. Tr. 6-9. This action followed on April 26, 2006.

## DISCUSSION

### A. Standard of Review

A court reviewing a decision of the Commissioner must determine whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." Green-Younger v. Barnhart, 335 F.3d 99, 105 (2d Cir. 2003) (quoting Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Further, the ALJ has "an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel." Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).

### B. The ALJ's Decision

To receive federal disability benefits, an applicant must be "disabled" within the meaning of the Social Security Act. An applicant is "disabled" if he can demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A). His impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A). In evaluating disability claims, the ALJ is required to follow a five-step process:

9

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (citation omitted).

The burden of persuasion rests on the claimant at steps one through four but shifts to the Commissioner at step five. Curry, 209 F.3d at 122-23 (discussing burden-shifting).

The ALJ found at step one that plaintiff had not engaged in any substantial gainful activity during the period in question. Tr. 16. At step two, the ALJ found that plaintiff suffered from "severe" impairments that did not meet or medically equal a listed impairment at step three. Tr. 16. At the fourth step, the ALJ found that plaintiff could not perform his past relevant work as a construction worker or a machine operator. Tr. 19. The ALJ concluded at step five that plaintiff was not disabled during the relevant period because he could perform a wide range of sedentary work.[2] Tr. 17.

---

[2] Sedentary work "involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day." Curry, 209 F.3d at 123 (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). Sedentary work also involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a).

10

## C. Treating Physician Rule

The Social Security Act recognizes a "rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." Green-Younger, 335 F.3d at 106. The opinion of a treating physician is "given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." Rosa, 168 F.3d at 78-79. In addition, the ALJ must supply "good reasons" for the weight given to the opinion of a treating physician. Halloran, 362 F.3d at 32. An ALJ who fails to accord controlling weight to the opinion of a treating physician must consider various "factors," including: "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." Id. (citing 20 C.F.R. § 404.1527(d)(2)).

The ALJ's determination cannot be sustained.

First, the ALJ discounted Dr. Abott's opinion—that plaintiff could sit for less than six hours and stand for less than two hours in an eight-hour work day—because it was not substantiated by the physical exams of February and June of 2005. Tr. 18. The ALJ's selective focus on these two exams, to the exclusion of Dr. Abott's other assessments, is inappropriate. In his notes on these two exams, Dr. Abott included results of tests of plaintiff's major organs but did not indicate whether he conducted any objective assessments, such as X-rays, MRIs or range of motion tests, of plaintiff's back, arm, or shoulder. Tr. 157-58. By contrast, Dr. Abott *did* perform range of motion tests in March of 2004 and found that plaintiff had limited movement in

11

both his spine and shoulder. Tr. 116-17. Indeed, the Social Security Administration's own consulting physician, Dr. Davis, confirmed on April 14, 2004 that plaintiff had limited range of motion in his spine and, in particular, had zero degrees of extension in his thoracic and lumbar spine. Tr. 125. Dr. Ramon Vallarino, who examined plaintiff once in January of 2005 at the behest of Dr. Abott and whose analysis the ALJ quotes with approval, likewise found that plaintiff had suffered an 80% loss of range of motion in his lumbar spine. Tr. 159. Dr. Abott's February and June 2005 reports ignore these obviously significant findings. Cf. Rosa, 168 F.3d at 81 (noting that the Commissioner was "precluded from relying on the consultants' omissions as the primary evidence supporting its denial of benefits" where "there was no indication in the reports that the consultants intended anything by their silence. . ."). Moreover, to the extent that Dr. Abott's February and June 2005 reports may have mistakenly omitted objective findings on plaintiff's back, arm, and shoulder, the ALJ was obliged to request this information before rejecting Dr. Abott's diagnosis. See id. at 79 (noting that "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record").

Second, the ALJ appears to have discredited the opinion of another of plaintiff's treating physicians, Dr. Jakobsen. Tr. 18. While defendant correctly asserts that the ALJ was not bound to accept Dr. Jakobsen's blanket conclusions that plaintiff was "disabled and unable to work," 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1), the ALJ erred in using the two isolated and incomplete reports of Dr. Abott as a basis for dismissing Dr. Jakobsen's other findings.

Third, the ALJ erroneously relied on the April 2004 residual functional capacity assessment which found that plaintiff could stand and sit for about six hours in a work day. Tr. 129. The ALJ characterized this exam as having been conducted by a "consultative physician."

Tr. 18. However, as plaintiff maintains—and the government concedes—this assessment was conducted by a disability examiner rather than a medical professional. The ALJ's reliance on this report as the opinion of a "consultative physician" and his use of it as "medical evidence" to discount the opinions of plaintiff's treating physicians was improper. See 20 C.F.R § 404.1513(a) (listing "acceptable medical sources" used to establish a medically determinable impairment such as "licensed physicians" but making no mention of disability examiners). The ALJ's reliance on this document is also troubling because its completion by a disability examiner appears to violate the Social Security Administration's own protocol for processing disability claims. Though the Commissioner allows disability examiners to "'assist in completion of the RFC assessment forms,' a medical (or psychological) consultant must sign the form 'to attest that he/she is responsible for its content, including the findings of fact and discussion of supporting evidence.'" Copeland v. Commissioner, No. 05-CV-3684, 2006 U.S. Dist. LEXIS 51578, at *15-16 (E.D.N.Y. July 27, 2006) (quoting Social Security Administration, Programs Operations Manual System § DI 24510.005 ¶ B.2.b). Moreover, the ALJ's treatment of the April 2004 assessment as medical evidence casts doubt on his ultimate finding that plaintiff could perform a wide range of sedentary work since this assessment provides the *only* explicit support in the record for the conclusion that plaintiff could sit for up to six hours in an eight-hour work day. While plaintiff's two treating physicians each concluded that plaintiff could sit for less than six hours in a work day, Dr. Davis, the consulting physician on whose conclusions the ALJ principally relied, gave no opinion whatsoever regarding plaintiff's ability to sit for extended periods of time. Rather, Dr. Davis's opinion that plaintiff required "moderate limitations" to certain daily activities extended only to "lifting, bending, climbing, and reaching with his

13

dominant arm." Tr. 125.

There is one final, curious omission in the ALJ's opinion: the lack of any discussion of the medications prescribed to plaintiff. At various points the record indicates that plaintiff was prescribed or was taking the following: Motrin, Flexeril, Ibuprofen, Crux, Celebrex, Tylenol, Lexapro, Hydroxyzine Pamoate, and Gabapentin. Not only does the ALJ's opinion contain no discussion of plaintiff's medications, but the ALJ appeared to studiously avoid the topic at the hearing. The moment plaintiff mentioned side effects of dizziness and sleepiness from pills he was taking, tr. 191, the ALJ changed the subject. The Court notes that the record itself does not clearly reveal what medications plaintiff was taking and at what times. Indeed, the stray, handwritten page entitled "Medicine Taken by Mr. Jorge Cruz Lara" begs the question of who authored this list and for what purpose. Tr. 165. Once again, however, it was incumbent on the ALJ when faced with this perplexing document to request additional information about plaintiff's medications before rejecting the treating physician's diagnosis. See Rosa, 168 F.3d at 79 (noting that "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history. . .").

Even if the ALJ had properly applied the treating physician rule, he still failed to assess the factors outlined in 20 C.F.R. § 404.1527(d)(2), especially "the frequency of examination and the length, nature and extent of the treatment relationship" and "whether the opinion is from a specialist." See Halloran, 362 F.3d at 32 (discussing factors). The record does not disclose the specialties of plaintiff's treating physicians nor is there any indication that the ALJ explicitly or implicitly took into account the frequency of examination, an especially important consideration for Dr. Abott, who had been treating plaintiff for nearly a decade *before* his work-related injury.

14

## D. Credibility Assessment

The ALJ found that plaintiff's testimony was "not entirely credible." Tr. 17. He did not elaborate. In addition to evaluating objective medical evidence, an ALJ making a disability determination must consider a claimant's statements about his own symptoms, including pain. 20 C.F.R. § 404.1529(c)(1). "Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings." Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999). However, an ALJ must consider the following factors when evaluating a claimant's symptoms:

> (1) [the claimant's] daily activities; (2) the location, duration, frequency, and intensity of [the claimant's] pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or [has taken] to alleviate [his] pain or other symptoms; (5) treatment, other than medication, [the claimant] receives or [has received] for relief of [his] pain or other symptoms; (6) any measures [the claimant] uses or [has] used to relieve [his] pain or other symptoms. . .; and (7) other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3).

Further, the ALJ's opinion "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Tornatore v. Barnhart, No. 05 Civ. 6858, 2006 U.S. Dist. LEXIS 90397, at *19 (S.D.N.Y. Dec. 12, 2006) (quoting SSR 96-7p). The ALJ failed to explain his finding that plaintiff's statements concerning the "intensity, duration and limiting effects of [his] symptoms are not entirely credible." Tr. 17. The ALJ's opinion is devoid of any analysis of plaintiff's pain allegations and bears no indication that he considered the factors in 20 C.F.R. § 416.929(c)(3). Indeed, the ALJ's only observation

15

concerning plaintiff's allegations of pain—that his impairments could "reasonably be expected to produce the alleged symptoms," tr. 17—bolsters rather than undermines plaintiff's credibility. Particularly surprising, as noted above, is the ALJ's failure to even mention the panoply of medications prescribed to plaintiff and the side effects alluded to by him at his hearing.

### E. Evidence Submitted to the Appeals Council

The record also contains two MRIs of plaintiff's lumbar and cervical spine—conducted on December 8, 2005 and January 4, 2006—that were submitted to the Appeals Council but that postdate the period encompassed by the ALJ's decision. The procedure for considering new evidence depends on when in the appeals process the evidence is submitted. If new evidence predating the ALJ's determination is submitted to the Appeals Council, such evidence automatically becomes part of the record. Perez, 77 F.3d at 46. See also Baladi v. Barnhart, No. 01-6155, 2002 U.S. App. LEXIS 6034, at *564 (2d Cir. Apr. 4, 2002) (unpublished opinion) ("Although the new evidence submitted to the Appeals Council forms part of the administrative record under review, it does so only to the extent that it relates to the time frame encompassed in the ALJ's decision."). Where, as here, the evidence postdates the ALJ's determination, a district court may consider such evidence only if it is material. 42 U.S.C. § 405(g); Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004). "New evidence is 'material' if it is both (1) 'relevant to the claimant's condition during the time period for which benefits were denied' and (2) 'probative.'" Pollard, 377 F.3d at 193 (quoting Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988)). Here, the MRIs of plaintiff's cervical and lumbar spine are material. In particular, the December 8, 2005 MRI of plaintiff's lumbar spine, which showed multilevel discogenic disease, tr. 178, disc desiccation and herniation at L3-4 and L4-5, tr. 177, and a mild broad-based annular disc bulge at

L5-S1, tr. 178, corroborates plaintiff's account of his condition and shows that it did not abate over time. Because the MRIs constitute objective medical evidence of plaintiff's condition and because the ALJ stated that the views of plaintiff's treating physicians were not supported by medical evidence, the Court finds that the MRIs are relevant to and probative of plaintiff's condition. On remand, the ALJ should thus consider the December 8, 2005 and January 4, 2006 MRIs in conjunction with the existing administrative record.

## CONCLUSION

A fair and objective assessment of the available medical evidence requires more than a highly selective harvesting of the limited evidence that supports a finding of no disability. As an initial matter, it presupposes a thorough and earnest search for relevant information that might inform the decisional process. The ALJ need not credit all the evidence tendered by the claimant, but he or she must be able and willing to confront it.

For the foregoing reasons, the case is remanded for further proceedings consistent with this opinion. On remand, the ALJ must make reasonable efforts to fill the above-cited gaps in the record concerning plaintiff's prescriptions and Dr. Abott's February and June 2005 examination reports. The ALJ must also properly apply the treating physician rule, reevaluate all the medical evidence in light of the fact that the April 2004 report was not authored by a physician, consider the December 8, 2005 and January 4, 2006 MRIs, and explain his negative

assessment of plaintiff's credibility, should it persist.


SO ORDERED.
Dated: Brooklyn, New York
     August 1, 2007

                                              s/ Judge Raymond J. Dearie
                                              RAYMOND J. DEARIE
                                              United States District Judge